# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

HOWARD ARNOLD, for himself
and all others similarly situated,
JIMMY JARAMILLO, for himself
and all others similarly situated,
GARY WISE, for himself and all
others similarly situated,

      Plaintiffs,

      vs.                       No. 09-CV-0330 JB/WDS

FARMERS INSURANCE COMPANY
OF ARIZONA, an Arizona corporation;
FARMERS GROUP INC., a Nevada
corporation,

      Defendants.

## DEFENDANTS' REPLY SUPPORTING CROSS MOTION FOR SUMMARY JUDGMENT

### I.    Introduction.

The plain language of the Uninsured Motorist Act ("UMA") defeats Plaintiffs' lawsuit as a matter of law and compels summary judgment for Defendants on all claims. Simply put, and as many courts have held, "property taken" is not "property damaged or destroyed." Plaintiffs seek to defeat Defendants' Cross Motion, however, not based on the UMA's plain language, which they tellingly ignore, but on three flawed themes: 1) the UMA's remedial purpose compels the Court to rewrite the statute; 2) the Mandatory Financial Responsibility Act ("MFRA") requires liability insurers to cover theft and so should the UMA; and 3) if the UMA is applied as written, there will be an undefined "gap in coverage." Each theme fails as a matter of law: 1) the statute's remedial purpose does not override its plain language; 2) the MFRA does not cover theft; and 3) there is no "gap in coverage." All of Plaintiffs' claims should, therefore, be dismissed with prejudice. This includes Jaramillo, who recently withdrew his claims for his

father's trailer and for physical damage to his father's bobcat.  He is now, just like the other Plaintiffs, only seeking coverage for theft without any accompanying physical damage.

For the reasons stated in our Cross Motion (Dkt. # 63) and below, Plaintiffs' other arguments, which the Court need not even address unless it finds that the UMA covers theft as a threshold matter, also fail as a matter of law.

## II.   "Injury to or Destruction of Property" Does Not Include "Theft" or "Loss of Use."

### A.   Neither a Remedial Purpose Nor a Liberal Construction Justify Disregarding the Plain Language of the UMA or Reading in Words That Are Not There.

Defendants are not seeking to reverse <u>any</u> case law, let alone "decades of New Mexico appellate jurisprudence," as Plaintiffs dramatically proclaim.  (Dkt. # 76 at 2)  Nor are Defendants asking the Court to add "exclusions" or "limitations" to the UMA.  (*Id.* at 2, 6, 11-12)  Defendants' position is simple and based on the UMA's plain language:  "injury to or destruction of property" does not include "theft" or "loss of use."  (Dkt. # 63 at 10-13)  Despite fifty-seven pages of briefing on the cross motions for summary judgment, Plaintiffs spend absolutely no time analyzing the UMA's actual words, except to tacitly agree that the UMA's plain language does not cover "theft" or "loss of use."  (Dkt. # 76 at 10)  They argue instead, that because the UMA is to be liberally construed in order to achieve its remedial purpose and public policy aim, its actual words do not matter, and that this Court should feel free to ignore them. (*Id.* at 7-12)

Plaintiffs cite no authority, and Defendants are aware of none, that would permit any court, even under the aegis of "liberal construction," to disregard the actual words of a statute or to read in words that are not there.  Indeed, the United States Supreme Court instructs that the law is exactly opposite:  "<u>generalized references</u>" to "<u>remedial purposes</u>" are insufficient <u>justification for reading a provision "more broadly than its language and the statutory scheme reasonably permit</u>."  *Touche Ross & Co, v. Redington*, 442 U.S. 560, 578 (1979) (interpreting securities legislation) (emphasis added); *see also Belland v. Pension Benefit Guar. Corp.,* 726 F.2d 839, 844 (D.C. Cir. 1984) (interpreting ERISA and stating that, while remedial statutes are to be liberally construed to effectuate their purpose, that principle "does not give the judiciary

2213174.1

license, in interpreting a provision, to disregard entirely the plain meaning of the words used by Congress") (quotations omitted).

This is equally true in New Mexico state courts.  In *Krahling v. First Trust National Association,* 123 N.M. 685, 944 P.2d 914 (App. 1997), for example, the New Mexico Court of Appeals refused to ignore the language of an insurance statute that created a fund for the protection of New Mexico residents in the event their insurers became insolvent.  The court concluded that 2,250 employees working for Honeywell, who invested in guaranty investment contracts with an insurer that became insolvent, were not covered by the statute and were, therefore, not entitled to compensation from the fund despite the compelling public policy underlying the statute.  In particular, the court stated:

> Honeywell argues generally that the purpose of the Guaranty Association is to protect New Mexico residents.   As such, Honeywell urges us to liberally construe the Guaranty Law because of its humanitarian policy and to enforce coverage in this instance.  We decline to give the Guaranty Law any construction but a reasonable one since the language of the statute is clear as applied to the GICs in this case . . . . We therefore decline to construe the Guaranty Law more broadly than its plain language allows.

*Id.* at 689-90, 944 P.2d at 918-19 (emphasis added) (citing, among others, Texas case noting that courts are not entitled, even in the name of liberal construction, to ignore statutory language).

Similarly, notwithstanding the public policy and remedial nature of New Mexico's Worker's Compensation Act, New Mexico courts have a long history of not using "liberal construction" as a justification for disregarding that statute's plain language.  *See Garcia v. N. M. State Highway Dep't,* 61 N.M. 156, 163, 296 P.2d 759, 763 (1956) ("we cannot close our eyes" to the statute's plain wording "even under the canon of liberal construction of the compensation act to effect its remedial purposes"); *Varela v. Mounho*, 92 N.M. 147, 149-50, 584 P.2d 194, 196-97 (App. 1978) (holding that provisions of the Workmen's Compensation Act "may not be disregarded in the name of liberal construction" and that the "unfairness" noted by those seeking its protection is "a matter of legislative policy, [whereas] we are bound to interpret and apply the law as it is given us") (quotations omitted).

3

The Tenth Circuit too, as well as this Court, recognizes that liberal construction does not provide a license to rewrite a statute.  *See, e.g., La. Pac. Corp.,* 106 F.3d 345, 349 (10th Cir. 1997) ("[A] court cannot interpret a statute in a way fundamentally inconsistent with its plain language in the name of liberal construction.") (superseded by subsequent change in statute by Congressional amendment as observed in *United States v. Schneider* 594 F.3d 1219, 1225 (10th Cir. 2010)); *Mitchell v. Bd. of Cnty. Comm'rs of  Cnty. of Santa Fe,* 2007 WL 2219420, at *13 (D.N.M. May 9, 2007) (Browning, J.) ("[Defendant] has not cited, and the Court has not discovered, any Supreme Court or Tenth Circuit caselaw discussing this issue.  In the absence of any affirmative direction from those courts, the Court is hesitant to adopt a rule, however persuasive, pragmatic, efficient, or well-grounded in public policy, that expressly contradicts the text of the rules Congress has approved.") (emphasis added).

New Mexico's legislature, consistent with this case law, has expressly emphasized the significance of a statute's plain language by codifying into law the primacy of statutory text: "[t]he text of a statute or rule is the primary, essential source of its meaning." N.M.S.A. § 12-2A-19 (emphasis added).  There is no exception for statutes with a remedial purpose.

This statutory directive and the foregoing federal and state authorities demonstrate that the plain language of the UMA – which speaks only of "injury to or destruction of property" and makes no reference whatsoever to "theft," "loss of use," or anything to that effect – cannot be overlooked or rewritten simply by emphasizing its public policy.  Indeed, as we explained in our Cross Motion, despite the UMA's remedial purpose and liberal construction, it is well settled that uninsured motorist coverage is not as limitless as Plaintiffs declare.  *See State Farm Auto. Ins. Co. v. Ovitz,* 117 N.M. 547, 550, 873 P.2d 979, 982 (1994) ("[u]ninsured motorist coverage is 'not intended to provide coverage in every uncompensated situation.'").

While Plaintiffs dismiss *Ovitz* as "unremarkable," (Dkt. 76 at 8), both this Court and other New Mexico courts have relied on it to emphasize that uninsured motorist coverage is not unlimited.  For example, this Court in *Valencia v. Colorado Casualty Insurance Company*, 560

F. Supp. 2d 1080 (D.N.M. 2007) (Browning, J.), quoted *Ovitz* in concluding that Colorado law,

rather than New Mexico law, should apply to an uninsured motorist dispute:

> [Plaintiff] is correct that the New Mexico courts have construed the [UMA]
> liberally and in favor of insureds.  He is also correct that the [UMA] guarantees an
> insured a minimum recovery.  Nothing in the language of the caselaw he cites,
> however, indicates that he is entitled to recover unlimited damages or even
> damages equal to the full limits under his policy.  To the contrary, the Supreme
> Court has acknowledged that uninsured motorist coverage is "not intended to
> provide coverage in every uncompensated situation."

*Id.* at 1093 (emphasis added).  *See also Richards v. Mountain States Mut. Cas. Co.,* 104 N.M. 47,

50, 716 P.2d 238, 241 (1986) (stating "uninsured motorist coverage . . . was not intended to

replace homeowner or household insurance"); *State Farm Mut. Auto. v. Marquez,* 130 N.M. 591,

593, 28 P.3d 1132, 1134 (App. 2001) (citing *Ovitz* and stating "[b]ecause the purpose of the

statute is remedial, we interpret its language liberally to further its objectives.  Nonetheless, we

recognize that uninsured motorist coverage is not intended to provide coverage in every

uncompensated situation, and that the policy of liberal interpretation, 'absent a clear statutory

provision to the contrary, may not negate reasonable and unambiguous policy limitations")

(emphasis added and citations omitted); *Dominguez v. Dairyland Ins. Co.,* 123 N.M. 448, 450,

942 P.2d 191, 193 (App. 1997) (upholding territorial limitation in policy and noting that

uninsured motorist coverage is not intended to provide coverage worldwide or "to provide

coverage in every uncompensated situation").

Plaintiffs' position takes the canon of liberal construction far beyond the language and

purpose of the UMA.  As demonstrated herein and in our Cross Motion, (Dkt. # 63 at 10-13), the

UMA's plain language – "injury to or destruction of property" which does not include "theft" or

"loss of use" – compels summary judgment for Defendants.

### B.   Plaintiffs' Reliance on the MFRA Is Also Unavailing.

Plaintiffs' next theme is to repeatedly emphasize the relationship between the UMA and

the MFRA and that the UMA was "designed to protect individuals against the hazard of

culpable, but uninsured, motorists and to place the insured in the same position as he or she

would have been had the tortfeasor had liability insurance."  (*See* Dkt. # 76 at 12-13 (emphasis

2213174.1

added))  In New Mexico, the MFRA requires that every owner or operator of a vehicle obtain minimum liability insurance.  N.M.S.A. § 66-5-201.1.  Plaintiffs argue, therefore, that the language used in the MFRA – "damages because of injury to or destruction of property including the loss of use thereof" – must be read into the UMA in order to accomplish the UMA's goal of putting the victim in the same position as if the uninsured motorist had liability insurance.  (Dkt. # 76 at 13)[1]

As an initial matter, this argument, again, ignores a well-settled canon of statutory construction that, in itself, compels summary judgment for Defendants:  when the legislature uses words in one statute but not another, the difference in wording is presumed to be intentional. (*See* Dkt. # 63 at 12-13)  This is particularly true when the legislature inserts words in one of two statutes that deal with closely-related subject matters.  *See, e.g., Blancett v. Dial Oil Co.*, 143 N.M. 368, 372, 176 P.3d 1100, 1104 (2008) (holding that the legislature's decision to include language about statutory agents in section 38-3-1(F) of the venue statute, but not in section 38-3-1(A) of the same venue statute "shows that it did not intend" for the sections to be treated the same); *Troise v. Extel Commc'ns, Inc.,* 784 A.2d 748, 754 (N.J. Super. Ct. App. Div. 2001) (*aff'd* 808 A.2d 96 (2002) (stating "where the Legislature has inserted a provision in only one of two statutes that deal with closely related subject matter, it is reasonable to infer that the failure to include that provision in the other statute was deliberate rather than inadvertent").  *See also* Dkt. # 63 at 13 (citing, among others, *Hanson v. Turney*, 136 N.M. 1, 4, 94 P.3d 1, 4 (App. 2004) (comparing language in different subsections of same statute and concluding differences intentional).  The MFRA and UMA overlap in subject matter and appear consecutively in the Motor Vehicle Code so the difference in wording can hardly be considered inadvertent.

But there is more.  Plaintiffs' argument is premised on the breathtaking (and erroneous)

---

[1] The issue here is not whether an insurer can exclude liability coverage for theft; policy exclusions only become relevant after the insured has established that there is a covered event under the policy's insuring clause.  As we explain in this section, neither the MFRA nor the UMA provide coverage for theft in the first place, and therefore, the enforceability of an exclusion is moot.  Thus, Plaintiffs' argument that Defendants' interpretation is a "misguided attempt to read exclusions into the Uninsured Motorist Act that are not contained therein," goes nowhere.  (Dkt. # 76 at 2, 6, 11-12)

2213174.1

proposition that the New Mexico Legislature, by inserting the words "including the loss of use thereof" in the MFRA, intended to require auto insurers to cover liability claims filed against their insureds for theft.  Plaintiffs' Motion says precisely that:  "In this matter each of the Plaintiffs would have the right to seek recovery of damages against the policies insuring the vehicles operated by the unidentified/uninsured motorists if the identity of the drivers, vehicles, and respective insurers was known."  (Dkt. # 58 at 12)  In other words, according to Plaintiffs' theory, if a thief used his insured car to steal Mr. Arnold's ATV and later got caught by the police, Mr. Arnold could sue the thief and the thief's liability insurer, which would be required to defend the lawsuit and pay for the theft under the liability provisions of the thief's auto policy.

This is flat wrong because the MFRA does not cover "theft"; nor does it cover "loss of use" standing alone.  Notably, other than relying (again) on the remedial purpose of the UMA, Plaintiffs do not cite any authority to support their position.  Here is why:  the numerous courts that have interpreted language like the MFRA have overwhelmingly ruled that "theft" or "loss of use" standing alone is not property damage.  We cited some of these cases in our Cross Motion, (Dkt. # 63 at 14-18), and we cite several more below.

Among them is the New Mexico case of *Lamb v. Randall,* 95 N.M. 35, 618 P.2d 379 (App. 1980), where a minor stole jewelry and coins from the plaintiff, and the property was never recovered.  The plaintiff sued the minor's parents for the value of the stolen property under section 32-1-46, which allowed a civil action to be brought against "the parent, guardian or custodian of a child when the child has maliciously or willfully injured a person or damaged or destroyed property, real or personal, belonging to the person bringing the action."  The trial court found the parents liable, and the parents appealed.  The New Mexico Court of Appeals reversed, stating that because there was no evidence that the property was "damaged or destroyed," as required by the statute, the parents were not liable.  *Id.* at 37, 618 P.2d at 381.[2]

Similarly, we already cited *Sadler v. Pacific Indemnity Co.,* CIV 08-670/RLP/LFG,

_____

[2] One judge dissented, invoking the remedial nature of the statute to argue that the parents should have been held liable for the theft even if the property was not damaged or destroyed, but the majority rejected that approach.

2213174.1

Memorandum Opinion and Order (D.N.M. Mar. 24, 2009) (Puglisi, J.), *aff'd* 363 F. App'x 260 (10th Cir. Jan. 27, 2010), in our Cross Motion.  There, Judge Puglisi, interpreting language nearly identical to the MFRA, held that the phrase "physical injury to or destruction of tangible property, including the loss of its use" means that "loss of use" must be accompanied by physical damage.  *Id*. at 9.  Plaintiffs make little effort to explain why *Sadler* is not dispositive here, relying (once again) only on the remedial nature of the UMA to suggest *Sadler* is inapplicable. But *Sadler* is not an anomaly; many courts have concluded that language similar, if not identical, to the "loss of use thereof" language in the MFRA (and to the property definition in the liability portion of Plaintiffs' policies with Farmers Arizona) does not cover theft and is not compensable unless accompanied by physical damage.

In *Collin v. American Empire Insurance Co.,* 26 Cal. Rptr. 2d 391, 407-08 (Cal. App. 1994), for example, a couple renting out their home sought coverage under their homeowner's policy after their tenant stole much of the landlord's personal property from the rental home, including paintings, a glass wall, furniture, and a bar.  The couple argued that the theft was "property damage," which their policy defined as "physical injury to or destruction of tangible property . . . including the loss of use thereof at any time resulting therefrom."[3]  *Id*. at 408.  The California Court of Appeals eviscerated this argument, stating that "loss of use" of property is not the same as "loss" of property, and that "virtually every other court to consider the question has held that it is not." *Id.* (emphasis added) (collecting cases).[4]  To illustrate its point, the court

---

[3] The policy had an alternative definition for property damage, which provided "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."  *Id.* at 408.  The court found this definition inapplicable because theft is an intentional act, and thus, did not constitute an "occurrence" under the policy.  *Id.* at 399-408.

[4] *Collin* cites the following cases, among others:  *Nortex Oil & Gas Corp., v. Harbor Ins. Co.,* 456 S.W.2d 489, 493 (Tex. App. 1970) ("There is a material difference between 'property taken' and 'property damaged'"); *Travelers Ins. Cos. v. P.C. Quote, Inc.,* 570 N.E. 2d 614, 618 (Ill. App. 1991) ("There is a difference between damage to property and loss of property."); *Gen. Ins. Co. of Am. v. Palmetto Bank,* 233 S.E.2d 699, 701 (S.C. 1977) (no property damage where the only damage was wrongful deprivation of property); *B&L Furniture Co. v. Transamerica Ins. Co.,* 480 P.2d 711, 713 (Or. 1971) (no coverage for property damage where furniture company improperly repossessed various items); *Inland Constr. Corp. v. Cont'l Cas. Co.,* 258 N.W.2d 881, 884 (Minn. 1977) (personal property may be converted "without causing physical damage or destruction to the property").

2213174.1

further explained:

> "Loss of use" of property is different from "loss" of property. To take a simple example, assume that an automobile is stolen from its owner. The value of the "loss of use" of the car is the rental value of a substitute vehicle; the value of the "loss" of the car is its replacement cost. The nature of "loss of use" damages is . . . "[t]he measure of damages for the loss of use of personal property [] determined with reference to the *rental value* of similar property which the plaintiff can hire *for use during the period when he is deprived of the use* of his property.

*Id.* at 408-09 (emphasis in original).

Like *Lamb* and *Collin*, many other courts have held that "loss of use" language similar to the MFRA only covers loss of use if there is also some contemporaneous physical damage to the property. (*See* Dkt. # 63 at 14-18) S*ee also, e.g., Metro. Cas. Ins. Co. v. Birmingham.*, 2010 WL 2214531, *5 (W.D. Wash. Jan. 15, 2010) (trespass not covered by policy language that covered "physical damage to or destruction of tangible property, including loss of use of this property") (collecting cases); *Cont'l Ins. Co. v. Bones,* 596 N.W.2d 552, 556 (Iowa 1999) (wrongful eviction not covered by policy where policy provided: "physical injury to or destruction of real property or tangible personal property including loss of use of the property" because there was no dispute that the premises "were not physically injured or destroyed"); *Mutlu v. State Farm Fire & Cas. Co*., 785 N.E.2d 951, 956 (Ill. App. 2003) (dispute over continuously running hot water to detriment of condominium neighbors not covered by policy language where "property damage means physical damage to or destruction of tangible property, including loss of use").

As several of these courts explain, it also makes no logical or grammatical sense to interpret "loss of use thereof" to mean anything else. For example, in *Coulter v. CIGNA Property & Casualty Cos.*, 934 F. Supp. 1101 (N.D. Iowa 1996), which Judge Puglisi cited with approval in *Sadler* (and which Defendants cited in our Cross Motion), the court painstakingly analyzed the sentence structure for the following definition of property damage – "any physical damage or destruction to tangible property, including the loss of the use of that property" – and concluded it did not allow for loss of use damages without some accompanying physical damage to the property. The District Court dissected the definition as follows:

The word "including" is defined as follows: "to take in or comprise as part of a

9

whole."  Thus, the clause "including the loss of the use of that property," is a subset of the clause, "physical damage or destruction to the tangible property." Undoubtedly, the prepositional phrase, "of that property" refers to "tangible property."  However, to conclude that it refers to tangible property, independent of the physical damage or destruction to tangible property, ignores the fact that "to tangible property" is also a prepositional phrase that modifies the subject of that first clause, "physical damage or destruction to tangible property" and neglects the significance of the word "including," which serves to link the two clauses.  The use of the word "including" indicates that "loss of the use of that property" is one example of tangible property that has been subject to physical damage or destruction.  If the second clause of the definition was meant to create a separate class of coverage that did not require physical damage or destruction to tangible property, the word "or" would be substituted in the place of the word "including."

*Id.* at 1121-22 (citations omitted; emphases added).  *See also, e.g., Gunderson v. Fire Ins. Exch.,* 44 Cal. Rptr. 2d 272, 280 (Cal. App. 1995) (stating that "[i]t is not logical to interpret the entire sentence as stating that the mere loss of use of any tangible property, without physical injury or destruction, may constitute 'property damage' and that, '[i]n context, the phrase 'including loss of its use' refers to the loss of use of tangible property that suffers some physical injury or destruction'").

This same reasoning applies to the MFRA's language.  The word "thereof" modifies "injury to or destruction of property."  And the word "including" instead of "or" instructs that "loss of use" is simply a subset of "injury to or destruction of property" not a separate type of damage.

Nothing in *Cress v. Scott,* 117 N.M. 3, 868 P.2d 648 (1994), on which Plaintiffs rely, changes this result.  In *Cress,* the plaintiff's car had been "damaged" by a repair shop's faulty repairs, but the defendant argued that, because the plaintiff did not actually incur rental charges for a replacement vehicle, he was not entitled to damages for the "loss of use" of the car while it was in the shop.  As noted in our Cross Motion, (Dkt. # 63 at 14), *Cress* merely held that "[t]he purpose of awarding loss-of-use damages is to provide reasonable compensation . . . during the time required for repair of damaged property."  117 N.M. at 6, 868 P.2d at 651 (emphasis added).  The present issue – whether "loss of use" standing alone constitutes "property damage" – was not before the court.  Indeed, there is no suggestion that the plaintiff in *Cress* would have been entitled to any loss of use damages if nothing had been physically wrong with his vehicle.

The foregoing demonstrates that the MFRA does not require liability coverage for theft, which means that Plaintiffs truly are in the same position they would have been in if the thieves had been caught and they had liability insurance.  Accordingly, Plaintiffs' reliance on the "loss of use thereof" language in the MFRA fails.

## C.    Defendants' Interpretation Does Not Create Any "Gap in Coverage."

Plaintiffs' third, and similarly-flawed, theme is that Defendants' interpretation of the UMA creates a "gap in coverage" that is antithetical to the public policy underlying the UMA.  (Dkt. # 76 at 7, 9, 17)  But other than repeating the words "gap in coverage," Plaintiffs do not explain their point.  To the extent this supposed "gap" implies that the MFRA requires liability coverage for theft, and so should the UMA, we have addressed this above – the MFRA does not cover "theft"; nor does it cover "loss of use" standing alone.  Moreover, the "gap in coverage" cases cited by Plaintiffs (and known to us) involve, unlike here, the interpretation of insurance policy provisions that exclude discrete groups of people based, for example, on the type of vehicle driven by the tortfeasor or where the accident took place.

In *Boradiansky v. State Farm Mutual Auto. Insurance Co.,* 141 N.M. 387, 156 P.3d 25 (2007), for example, the New Mexico Supreme Court invalidated a policy provision that defined "uninsured motor vehicle" to exclude a vehicle "owned by a government or any of its political subdivisions or agencies."  The court emphasized that the exclusion created a discrete group of drivers who would not be covered by the UMA – i.e., those injured by government-owned vehicles.  *Id.* at 389, 156 P.2d at 27.  The "gap" in *Boradiansky*, therefore, was that victims injured by government-owned vehicles would get no coverage, whereas victims injured by other vehicles would get coverage; it was impermissible to base the deciding factor on the type of car the tortfeasor was driving.

Similarly, in *Chavez v. State Farm Mutual Automobile  Insurance Co.,* 87 N.M. 327, 533 P.2d 100 (1975), the New Mexico Supreme Court invalidated a provision in an uninsured motorist policy that excluded coverage when the insured was, at the time of injury, occupying an uninsured motor vehicle owned by him.  In *Chavez,* although the victim had another vehicle with

11

2213174.1

liability and uninsured motorist coverage, he was driving his uninsured vehicle (a motorcycle) when the accident happened.  The New Mexico Supreme Court stated that it was not the intent of the UMA "to limit coverage for an insured to a particular location or a particular vehicle" and that doing so created an improper "gap in coverage."  *Id.* at 330, 533 P.2d at 103.  The "gap" in *Chavez*, therefore, was that coverage depended on where the victim was located:  if the insured was located in his <u>un</u>insured vehicle, he would get no coverage, but if he was located in his insured vehicle he would get coverage.

Unlike these examples, Defendants' interpretation of the UMA does not create any discrete group or situation-based exclusion, and thus does not create a "gap" between one group of insureds who will be covered and another group who will not.  On the contrary, Defendants' interpretation urges that no theft – no matter the type of property stolen, the manner in which it was stolen, where it was located, when it was stolen, the status of the thief or victim, or other factor – is covered by the UMA.  The specific facts from the "gap in coverage" cases discussed above illustrate this point:  1) neither insureds who have their property stolen by individuals driving government-owned vehicles, nor insureds who have their property stolen by individuals driving privately-owned vehicles, will get uninsured motorist coverage for the theft of their property (*Boradiansky*), and 2) neither insureds whose property is stolen from their <u>un</u>insured vehicle, nor insureds whose property is stolen from their insured vehicle, will get uninsured motorist coverage for the theft of their property (*Chavez*).  Thus, Plaintiffs' "gap" theory is not relevant to the analysis here.

  **D.**  **Uninsured Motorist Coverage Is Not the Equivalent of "Property Insurance" of "Physical Damage" Under the Insurance Code.**

Plaintiffs also rely on two definitions in the Insurance Code (Chapter 59A).  One, which generally defines "property insurance" to include "loss" of real or personal property, and another, which defines "physical damage" in the context of general "vehicle insurance" to include "loss of or damage to any land vehicle or aircraft . . .or . . . animal."  N.M.S.A. §§ 59A-7-4 and 59A-7-7.  As with the MFRA, this argument ignores the well-settled canon of statutory

2213174.1

construction that when the legislature uses words in one statute but not another, the difference in wording is presumed to be intentional, particularly for statutes that deal with closely-related subject matters.  (*See supra* at p. 6; *see also* Dkt. # 63 at 11-13)  It also ignores another fundamental principle of statutory interpretation, which instructs that where one statute deals with a subject in a general manner and another statute addresses part of the same subject matter in a more specific manner, the more specific statute controls.  *State v. Davis,* 129 N.M. 773, 775, 14 P.3d 38, 40 (App. 2000); *see also State v. Santillanes*, 130 N.M. 464, 469, 27 P.3d 456, 461 (2001) (rule applies to both civil and criminal statutes).

But in any event, Plaintiffs do not seriously contend that the UMA is the equivalent of "property insurance."  Indeed it is not; the UMA relates to liability insurance.  *See Pielhau v. RLI Ins. Co.,* 144 N.M. 554, 558, 189 P.3d  687, 691 (App. 2008) (characterizing the UMA as a "liability statute").  This is apparent from its placement, immediately following the MFRA – which is a liability statute – in the Motor Vehicle Code (the MFRA is located at Chapter 66, Article 5, Part 4 in the Motor Vehicle Code and the UMA is located nearby at Chapter 66, Article 5, Part 3, also in the Motor Vehicle Code) and far away from the "property insurance" definition in the Insurance Code (located in a different chapter altogether:  Chapter 59A, Article 7).  This is also obvious from the UMA's intent, as Plaintiffs repeatedly argue, to place the victim of an accident in the same position as if the tortfeasor had <u>liability insurance</u>.  (*See* Dkt. # 76 at 12-13)

Similarly, the Insurance Code's definition of "physical damage" for "vehicle insurance" does not implicate the UMA, either.  First, section 59A-7-7 is general and covers many different types of vehicles, including "aircrafts" and "riding animals," whereas the UMA is more specific and applies only to "motor" vehicles.  Second, "motor vehicle insurance" is also more specifically defined and only requires insurance policies to include the "liability coverages" set forth in the MFRA and the uninsured motorist coverage set forth in the UMA (which, as discussed above, is itself a form of liability insurance).  *See* N.M.S.A. § 66-1-4.11 (I) (defining "motor vehicle insurance").  Of course, motor vehicle insurance "may" include additional

2213174.1

coverage, including physical damage or other terms to which the insured and insurer agree, but it is not required to.  Indeed, as noted, Plaintiffs could have purchased theft coverage for the stolen items in the form of comprehensive coverage, but did not do so.  (Dkt. # 63 at ¶¶ DSUF 3, 20, 39, 43, 44)

* * * *

In sum, for all of the forgoing reasons, as well as the reasons stated in our Cross Motion, the phrase "injury to or destruction of property" requires physical damage to property and does not include "theft" or "loss of use."  Neither a liberal construction nor analogy to the MFRA or distant portions of the Insurance Code changes that result.  Defendants' Cross Motion should therefore be granted and <u>all</u> of Plaintiffs' claims dismissed.  We now say "all" because Jaramillo has withdrawn both his claim for his father's trailer and his claim for physical damage to his father's bobcat.  (Dkt. # 76 at 4 ¶ 10)  As such, Jaramillo's claim, which is now limited only to loss of use (i.e. theft) damages for the time that it was temporarily missing, is, like the other Plaintiffs' claims, not accompanied by physical damage, and thus, fails under the UMA's plain language.

This issue, therefore, completely disposes of Plaintiffs' lawsuit, and the Court need not read any further to grant our Cross Motion.  But if the Court finds that the UMA somehow covers theft, Defendants are entitled to summary judgment for the additional reasons stated below and in our Cross Motion.

III.    **Nothing in Plaintiffs' Response Changes the Result that Jaramillo Has No Insurable Interest, Suffered No Damages, and Lacks Standing.**

The following facts are undisputed:  Jaramillo suffered no financial loss from the bobcat's theft; he considered his father to be its full owner; any payment he made toward the bobcat was a gift, for which he never expected to be repaid; he never invested money in Sonny's Trees; he never shared in any of the profits of Sonny's Trees; he never received any income from Sonny's Trees other than as an occasional day laborer; and he would have transferred title in the bobcat to his father had either one thought about it.  (Dkt. # 63 at DSUF ¶¶ 23-26, 27-29, 32, 38 ,

14

2213174.1

& pp. 18-21; *see also* Dkt. # 76 at 3-4, 30)  Nonetheless, Plaintiffs argue that there are three bases on which Jaramillo derives an insurable interest in the bobcat. Each one is without merit.

Plaintiffs first argue that Jaramillo "had an interest in seeing Sonny's Trees succeed." (Dkt. # 76 at 21)  Plaintiffs, conspicuously, do not cite any authority that Jaramillo's altruistic feelings toward his father give rise to an insurable interest.  This is no surprise because neither a family relationship nor affection for the true owner of the property creates an insurable interest. *See, e.g., Sayah v. Metro. Prop. & Cas. Ins. Co.,* 733 N.W.2d 192, 196 (Neb. 2007) (stating, that "[n]either family use of property nor the family relationship alone gives automatic rise to an insurable property interest" and also holding that occasional use by parent of son's vehicle does not create an insurable interest); *Brewton v. Ala. Farm Bureau Mut. Cas. Ins. Co., Inc*., 474 So.2d 1120, 1123 (stating "[m]ere love and affection for the true owner, though laudable, do not constitute the required insurable interest"); 44 Am. Jur. 2d *Insurance* § 971 (2003) ("The relationship of parent or child does not constitute an insurable interest in property owned by the other."); 44 C.J.S. *Insurance* § 329 (2007) ("Mere love and affection for the true owner do not constitute the required insurable interest").

Second, Plaintiffs argue that because the finance company could have compelled Jaramillo to make payments on the bobcat if Sonny failed to do so, Jaramillo has an insurable interest.  (Dkt. # 76 at 21-22)  This argument ignores an undisputed and dispositive fact:  <u>At the time of the theft</u>, the bobcat was already fully paid for.  (Ex. 15, attached hereto (S. Jaramillo Depo. at 40 and J. Jaramillo Depo. at 26))  As such, the fact that Jaramillo had been financially responsible for the debt does not give rise to an insurable interest "at the time of its loss."  *See, e.g., Vance v. Wiley T. Booth, Inc*., 436 S.E.2d 256, 602-04 (N.C. App. 1993) (holding that daughter had no insurable interest in a home that was damaged by fire because she no longer remained personally liable on the debt; did not possess, use, or enjoy the property; and there was no evidence she paid for any repairs).  Indeed, as Plaintiffs expressly recognize in their Response, New Mexico law measures an insurable interest "at the time of the loss."  (*See* Dkt. #

2213174.1

76 at 20 (quoting from section 59A-18-6) & 21 (stating test for "insurable interest in New Mexico is whether, at the time of loss . . .""))

Third, Plaintiffs contend that Jaramillo's status as the nominal title holder subjected him to potential liability to third parties, which in turn, gives him an insurable interest.  (Dkt. # 76 at 21-22)  While the potential for liability can give rise to an insurable interest, Plaintiffs do not explain how Jaramillo could have been subject to potential liability simply by being the title holder.  In fact, in the absence of a statute to the contrary, a car owner in New Mexico "is not liable for the negligence of a person using it with his permission."  *Bryant v. Gilmer*, 97 N.M. 358, 360, 639 P.2d 1212, 1214 (N.M. App. 1982)  Defendants have found no statutes to the contrary.  In fact, the MFRA has been interpreted <u>not</u> to impose liability based on mere ownership.  *See Maya v. Gen. Motors Corp.,* 953 F. Supp. 1245, 1248 (D.N.M. 1996) (Black, J.) (anticipating that the New Mexico Supreme Court "would conclude that the MFRA does not render vehicle owners vicariously liable for injuries their vehicles cause while being driven by another")[5]; *Cordova v. Wolfel,* 120 N.M. 557, 559-60, 903 P.2d 1390, 1392-93 (1995) ("The New Mexico legislature has not enacted legislation that would make vehicle lessors generally liable for injuries that result when lessees negligently use their vehicles, and we decline to take that step in the absence of legislative action."); *Toscano v. Spriggs,* 681 A.2d 61, 64 (Md. 1996) ("Mere ownership of a car does not impose liability for injuries caused in the driving of it.").

Putting aside insurable interest, Plaintiffs do not dispute that Jaramillo testified that he did not suffer any financial loss from the theft of the bobcat.  (*See* Dkt. # 63 at DSUF ¶ 38 & p. 20)  Instead, they dismiss this testimony as "not relevant," arguing that Jaramillo's standing and damages stem from his non-economic loss – i.e., no longer getting the satisfaction of knowing that his father is using the bobcat to further his business aims to provide support for other family members.  (Dkt. # 76 at 22)  Plaintiffs, of course, do not cite any authority to support their contention that Jaramillo is entitled to damages for the loss of personal satisfaction.  Indeed, the

---

[5] But even if it did, the MFRA does not require vehicles, like the bobcat, to be insured.  *See* N.M.S.A § 66-1-4.11, 66-1-4.16 (excluding special mobile equipment from the MFRA).

following authorities demonstrate that to the extent Jaramillo seeks damages, he must demonstrate a compensable loss. *See, e.g., Stevens v. Mitchell,* 51 N.M. 411, 414, 186 P.2d 386, 389 (1947) (to recover for breach of contract, party must show the contract, its breach, and <u>actual loss and resultant damages</u> sustained must be established by a preponderance of evidence); N.M.S.A. §§ 59A-16-30 ("Any person covered by Chapter 59A, Article 16 N.M.S.A. 1978 who has <u>suffered damages</u> as a result of a violation . . . . is granted a right to bring an action in district court <u>to recover actual damages</u>.") (emphases added); 57-12-10 (A) - (B) ("[a] person <u>likely to be damaged</u> . . . may be granted an injunction" and "any person who suffers "[a]<u>ny loss of money or property</u> . . . may bring an action <u>to recover actual damages</u>.") (emphases added).

And as to his claims for declaratory or injunctive relief, which are directed at how Farmers Arizona must treat its insureds in the future, Jaramillo cannot assert those claims either because he is no longer a Farmers insured.  (Dkt. # 21 at ¶¶ 51-55 and Prayer for relief at F; Dkt. # 67 at 7; Ex. 16, attached hereto (S. Jaramillo Depo. at 56 & J. Jaramillo Depo. at 38))  As a former insured, he is not suffering from any real or immediate threat of being injured in the future, and he therefore lacks standing to seek prospective relief.  *See, e.g., Dias v. City & Denver Cnty*, 567 F.3d 1169, 1177 (10th Cir. 2009) (to seek prospective relief, a plaintiff must a be suffering from "continuing injury" or be under a real and immediate threat of being injured in the future); *PeTA v. Rasmussen*, 298 F.3d 1198, 1203 (10th Cir. 2002) (holding PeTA did not have standing to assert a declaratory judgment claim for prospective relief because it was not suffering a continuing injury).

Accordingly, all of Jaramillo's claims should be dismissed for these additional reasons, which are unique to his claim.

**IV.    The Thefts Did Not "Aris[e] Out of the Ownership, Maintenance or Use of a Motor Vehicle," Nor Were They Caused by "Owners or Operators of Uninsured Motor Vehicles" From Whom Plaintiffs Are "Legally Entitled to Recover Damages."**

We refer the Court to the arguments in our Cross Motion, (Dkt. # 63 at 21-29), and we

2213174.1

merely clarify a few issues raised by Plaintiffs in their Response.[6]

> **A.      Plaintiffs' Attempt to Distinguish the Case Law is Unavailing.**

As noted, for purposes of this briefing only, Defendants accept for argument sake that vehicles were involved at some point in Plaintiffs' thefts.[7]  (Dkt. # 63 at 21)  Plaintiffs, treating this as a game-ending concession, argue that their case is different from the numerous cases we cited in our Cross Motion because, allegedly, the tortfeasors in those cases "abandoned" their vehicles prior to the crime, whereas here, Plaintiffs say the vehicles were used to "complete the harm."  (Dkt. # 76 at 28, 31-32)  In so arguing, Plaintiffs assert that the vehicles did more than merely transport the tortfeasors to the scene of the crime; they were also used to approach the property and to remove the property from the scene of the crime.  (*Id.*)  Plaintiffs, however, misread the cases in which this Court and others have granted summary judgment to insurers on similar facts.

Plaintiffs, for example, contend that the tortfeasor in *Hartford Insurance Co. v. Estate of Tollardo*, 409 F. Supp. 2d 1301 (D.N.M. 2005), unlike this case, "abandoned his vehicle." (Dkt. # 76 at 28)  Not so.  While the tortfeasor did exit his vehicle before killing his victims, Plaintiffs fail to explain that he returned to his vehicle afterwards and used it to escape the scene.  Thus, under Plaintiffs' theory, the tortfeasor in *Tollardo* "completed the harm" by using his vehicle to escape.  This Court nonetheless granted summary judgment for the insurer, anticipating that New Mexico would hold that use of a vehicle to escape does not meet the active accessory test.  *Id.* at 1310.  *See also, e.g., Farmers Ins. Co. of Ariz. v. Sedillo*, 129 N.M. 674, 676, 11 P.3d 1236, 1238 (App. 2000) (affirming summary judgment for the insurer where the vehicle was used to

---

[6] One clarification relates to Plaintiffs' assertion that we somehow conceded that the bases Farmers Arizona gave during the claims process for not paying Plaintiffs' claims were "unfounded, unreasonable, and in violation of public policy."  (Dkt. # 76 at 34)  We did not. There was (and is) no reason for us to debate Farmers Arizona's bases for not paying Plaintiffs' pre-litigation claims because the cross motions are about coverage.  Whether coverage exists is a present-tense issue and requires an analysis of the scope of the UMA, or alternatively the facts of each theft, without regard to the specific positions either side took during the claims handling process.

[7] This, however, is not a foregone conclusion for the reasons stated in our Opposition to the Motion to Certify Class.   (*See* Dkt. # 67 at 12)

2213174.1

speed through a parking lot, which provoked a fight with a tailgater, and then was used to escape after severely beating the tailgater); *Kohn v. Ross,* 1998 WL 157364, *2 (Minn. App. Apr. 7, 1998) (affirming ruling in favor of insurer where the vehicle was used to transport the assailants and their guns to the scene of the shooting and then as a means to flee the scene).

Another example, one which Plaintiffs conspicuously ignore in their Response is the Oklahoma City Bombing case of *Mayer v. State Farm Mutual Insurance Co.,* 944 P.2d 288, 291 (Okla. 1997), where a rental car transported a bomb to the Murrah Federal Building; concealed the bomb before the explosion; and, in the court's words, essentially served as a "container" for a weapon and the actual "implement of destruction." *Id*. at 289, 291. While there is no doubt that Timothy McVeigh used the rental truck to "complete the harm," the Oklahoma Supreme Court nonetheless held this did not justify awarding uninsured motorist coverage. *Id*. at 291.

It is hard to conceive of a scenario in which the thieves here did not, like the tortfeasors in *Tollardo*, *Sedillo*, *Kohn*, and *Mayer*, exit their vehicles before stealing the property and then return to their vehicles to escape the scene with the stolen property after committing the thefts. And Plaintiffs have offered no facts to support any alternative scenarios. But even when the vehicle serves as the situs of the crime – i.e., where the harm is actually carried out in the vehicle – that has not compelled uninsured motorist coverage. For example, in *Harrison v. Affirmative Ins. Co.,* CIV 06-0552-WPJ/WPL, Memorandum Decision, at 12 (D.N.M. June 4, 2007) (Johnson, J.), the New Mexico District Court concluded that the vehicle did not meet the "arising out of" requirement where an attacker got into the victim's car; demanded that the victim drive him to a specific location; shot the victim while they were both still in the car; and then, after the victim escaped from the vehicle, drove away in the victim's car. Similarly, in *Edwards v. State Farm Mutual Automobile Insurance Co.*, 399 N.W.2d 95, 96-99 (Minn. App. 1986), the court held that the murder in that case did not "arise out of" the use of a vehicle even though the assailant forced the victim into his car; drove her to a secluded area sixty miles away; assaulted

and murdered the victim inside the car; drove off in the car, leaving her body behind; and then took the car to the junkyard to have it destroyed.[8]

In each of these cases (and more), vehicles were used, in Plaintiffs' words, "to complete the harm," yet summary judgment was granted for the insurer.  Defendants submit that these cases are the most analogous to the facts here and that summary judgment should, therefore, be granted in their favor on each of the Plaintiffs' individual claims.

Plaintiffs' reliance on *State Farm Mutual Automobile Insurance Co. v. Blystra*, 86 F.3d 1007 (10th Cir. 1996) and *Barncastle v. American National Property & Casualty Companies*, 129 N.M. 672, 11 P.3d 1234 (App. 2000), does not change this result.  For the reasons already stated in our Cross Motion, *Blystra* is distinguishable from the facts here because the assailants in *Blystra* used the vehicle to exploit the element of surprise by quickly creeping up to the victim without revealing their intent to cause harm and shielding the assailant and his weapon from public view, and also as a quick means of escape to avoid apprehension. 86 F.3d at 1012.  (*See* Dkt. # 63 at 26-27)  Plaintiffs have not produced any evidence that the vehicles here were similarly used to create an element of surprise or that thefts here otherwise took place under similar circumstances.

*Barncastle,* which relies heavily on *Blystra,* is also distinguishable from the facts here for many of the same reasons.  There, an unidentified vehicle pulled up next to Barncastle's car at a red light late in the evening.  While the vehicle remained running at the light, the passenger, without any warning; exited the vehicle; walked to Barncastle's window, and shot him.  The assailant then quickly returned to his vehicle and the vehicle fled the scene at a high rate of speed and with its headlights off.  129 N.M. at 673-74, 11 P.3d at 1235-36.  The *Barncastle* court noted that the way the car pulled up to the red light alongside the victim's car communicated a false sense of innocence that enabled the tortfeasors to conceal the upcoming events, and the fact that the driver kept the car running during the attack helped to conceal the identity of the driver, the

---

[8] In addition to these cases, we cited two other cases in our Cross Motion holding that there was no uninsured motorist coverage despite the fact that the crime actually took place in the vehicle. (*See* Dkt. # 63 at 28-29)  Plaintiffs do not address either of these cases.

2213174.1

shooter, and the presence of the gun.  *Id.*[9]  Again, Plaintiffs have not produced any evidence that the thefts here took place under similar circumstances.

Not only that, Plaintiffs also claim that the nuances of the crimes in *Blystra* and *Barncastle* are completely irrelevant and need not be considered, stating:  "whether the tortfeasors drove away from the scene of the crime slowly, or carefully secured their illicit cargo prior to departing, is irrelevant" and further that "whether the thieves acted covertly, quickly, slowly, or fled the scene at a high rate of speed is irrelevant to this Court's inquiry."  (Dkt. # 76 at 31) (emphases added)  This argument highlights Plaintiffs' misreading of the law, which overwhelmingly provides that the "arising out of" inquiry demands an intensely fact-specific analysis of all of the surrounding facts.  *See, e.g., Britt v. Phx. Indem. Ins. Co.*, 120 N.M. 813, 818-19, 907 P.2d 994, 999-1000 (1995) (adopting three-part test from *Continental Western Insuranc Co. v. Klug,* 415 N.W.2d 876, 877-78 (Minn. 1987), wherein the *Klug* court explained the "arising out of" analysis "defies a simple test" and turns, "to a great degree," on the "particular facts presented"); *Harrison,* CIV 06-0552-WPJ/WPL, at 7 (stating whether an injury arises out of the use of a vehicle "depends on the particular facts presented in each case").  Indeed, the unique features of *Blystra* and *Barncastle* were particularly relevant to this Court in *Tollardo*, where it spent seven paragraphs discussing them, before concluding that, as a matter of law, the vehicle used in that case was not an active accessory.  409 F. Supp. 2d at 1310-12 (citing *Blystra* and *Barncastle*, noting "this case still lacks certain features that have led New Mexico courts and the Tenth Circuit in other cases to conclude that an automobile was an active accessory").

**B.     That the ATV and Bobcat Thefts <u>Could</u> Have Occurred Without a Vehicle Weighs Against a Finding of Active Accessory.**

Plaintiffs misunderstand our point about how the ATV and bobcat thefts <u>could</u> have

---

[9] Plaintiffs also state that whether it was the passenger or the driver who shot the victim does not change the fact that the vehicle was an integral part of the shooting in *Barncastle*.  (Dkt. # 76 at 26).  It does, however, implicate the UMA's other prong - which the *Barncastle* court did not analyze - whether the injuries were caused by "owners or operators of uninsured vehicles" from whom victims are "legally entitled to recover damages,"  We discuss this requirement, which also weighs in favor of Defendants, below.

21

occurred without the use of a vehicle:  even assuming vehicles were involved at some point in the thefts, if it was feasible to accomplish the thefts without using a vehicle, then the vehicles cannot be considered "active accessories."  (Dkt. # 76 at 29; Dkt. # 63 at 24)  This is best illustrated by two of the cases cited in our Cross Motion.  First, in *Kohn,* the court noted that while a car transported the assailants and their guns to and from the scene of the shooting, the injuries to Mr. Kohn could have occurred had the assailants arrived on foot, and therefore, the vehicle was not an active accessory.  1998 WL 157364 at *2.  Second, as for the murder in *Edwards*:

> The physical injuries . . . inflicted . . . were devastating and tragic, but they were not related to [the assailant's] "use" of his motor vehicle.  [The assailant] could have accomplished the same end without the use of a motor vehicle.  The fact that the injures were inflicted in the vehicle cannot by itself elevate the vehicle to the status of an active accessory . . . .[10]

399 N.W. 2d at 98 (emphasis added).  The same rationale applies here.  These thefts could have taken place without any vehicle, which weighs against a finding that the vehicles constitute active accessories.

### C.    Mere Use of a Vehicle Does Not Advance Plaintiffs Through the Intervening Significance/Intervening Cause Prong of the "Arising Out Of" Analysis.

Even Plaintiffs' discussion of the "intervening cause" prong relies primarily on their theme that because vehicles were used to "complete the harm," the thefts "ar[o]se out of the ownership, maintenance, or use of a motor vehicle."  (Dkt. # 76 at 32 (stating "as repeatedly demonstrated, the thieves in each instance completed the theft by use of a motor vehicle."))  For the reasons already discussed, these vehicles no more "completed the harm" to Plaintiffs than the rental truck in the Oklahoma City Bombing case did.

Plaintiffs also argue that Defendants have shown no facts of an intervening cause or act of independent significance breaking the causal nexus between the use of the vehicle and the theft.  (*Id.*)  Notably, it is Plaintiffs who bear the burden of proof.  Moreover, our Cross Motion provides significant detail about how the thieves had to locate the property, exit their vehicles,

---

[10] This Court, in *Tollardo*, cited both *Kohn* and *Edwards* approvingly.  And as already noted, *Britt* adopted its three-part test from the Minnesota Supreme Court case of *Klug*.  Thus, New Mexico finds authorities from Minnesota particularly persuasive.

2213174.1

push or carry the property, and in Wise's case even jump a wall and open a gate, any one of which gives rise to an intervening act.  (*See* Dkt. # 63 at DSUF ¶¶ 5, 6, 8, 10, 17,18, 19, & pp. 26-27)

> **D.**   **Plaintiffs Do Not (and Cannot) Distinguish *Baldonado* and Cannot Establish That the Thefts Were Caused by "Owners or Operators of  Uninsured Motor Vehicles" From Whom They Are "Legally Entitled to Recover Damages."**

Plaintiffs admit they have no idea who took their property, whether the driver actively participated in the taking, or whether the driver believed the thieves had permission to take the property.  (Dkt. # 63 at DSUF ¶¶ 11-12, 17-18, 35; Dkt. # 58 at PSUF ¶ 13)  Plaintiffs are simply guessing about the role or intent of the driver of any of the vehicles, and guesses are insufficient. When there is, as here, no evidence that the owner or operator of any vehicle, if known, would be legally liable to any of the Plaintiffs for the thefts, summary judgment should be granted in Defendants' favor.  (Dkt. # 63 at 29-30).  Tellingly, Plaintiffs' Response is silent about *State Farm Mutual Automobile Insurance Co. v. Baldonado*, 134 N.M. 197, 199, 75 P.3d 413, 415 (App. 2003), where the New Mexico Court of Appeals granted summary judgment for State Farm and rejected a similar argument that the driver was legally liable simply because the driver was involved in the series of events that led up to and followed that shooting.  The same reasoning compels summary judgment for Defendants here.

**V.**     **Conclusion.**

For the forgoing reasons and those stated in Defendants' Cross Motion, (Dkt. 63), Defendants ask the Court to grant our Cross Motion dismissing all of Plaintiffs' claims.


DATED this 16th day of July, 2010.

23

Respectfully submitted,

LEWIS AND ROCA LLP


By /s/ Emily S. Cates
    Steven J. Hulsman
    Emily S. Cates
    40 North Central Avenue
    Phoenix, Arizona  85004-4429
    Phone:  602-262-5311

    and

    Ross L. Crown
    201 Third St. NW, Suite 1950
    Albuquerque, New Mexico 87102
    Phone:  505-764-5400
    Fax:  505-764-5480
    *Attorneys for Defendants*

24

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of July, 2010 I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing and/or addressed as follows:


Geoffrey R. Romero, Esq.
Law Offices of Geoffrey R. Romero
4801 All Saints Road NW, Suite A
Albuquerque, NM  87120-3111
Attorneys for Plaintiffs

Matthew L. Garcia, Esq.
Bach & Garcia LLC
300 Central SW, Suite 2000 East
Albuquerque, NM  87102-3298
Attorneys for Plaintiffs



*/s/ Emily S. Cates*
       Emily S. Cates

2213174.1